THE STATE OF OHIO, EX REL. SCHULMAN ET AL., *v.* CITY OF CLEVELAND.

[Cite as State, ex rel. Schulman, v. City of Cleveland, 8 Ohio Misc. 1.]

(No. 827067—Decided August 8, 1966.)

INJUNCTION PROCEEDING: Cuyahoga County Common Pleas Court.

Mr. John P. Butler, for plaintiff Milt Schulman.

Mr. Milt Schulman, for plaintiff Tower Development and Investment Corporation, Inc.

Mr. Bronis J. Klementowicz, director of law, Mr. Richard J. Marco and Mr. James P. Mancino, assistant directors of law, for defendant City of Cleveland.

Mr. Robert F. Belovich, for defendant Boyas & Bauman Ex., Inc.

LYBARGER, J. The question with which this case is concerned is whether a city, which has adopted a general plan that anticipates eventual urban renewal in a given area, may lawfully proceed under its housing and building codes to inspect properties in a badly deteriorated slum area, find what administrative officials declare to be numerous code violations inimical to public safety, health and welfare, give notice to the owners

that their houses shall be demolished unless violations are corrected, procure from city council an ordinance ordering such buildings to be torn down, and then, on authority of the codes and legislation enacted thereunder, demolish such structures without paying compensation to the owners.

The plaintiffs, owners of two old boarded-up frame dwellings on Hough Avenue in Cleveland, seek an injunction against the city demolishing their premises on the ground that they are not a nuisance; that the city is not proceeding with urban renewal but is seeking fraudulently and by an abuse of its police power to get these and many other vacant properties in the general area without compensating for them; that this amounts to a lack of due process; and that the ordinances under which the city has taken action are unconstitutional.

The city denies that there is any irregularity or lack of due process in its proceedings, asserts that its ordinances define building and housing standards which must be maintained, provide ample notice and the right of administrative appeals (which plaintiffs have failed to follow) and that said ordinances are constitutional.

STATEMENT OF FACTS.

June 12, 1961, the council of the city of Cleveland adopted "University-Euclid General Neighborhood Renewal Plan, Ohio R-32" (Ord. No. 1338-61, Pltfs. Ex. 3), which conforms to the General Plan of Cleveland (1949). The general renewal plan embraced four areas that were designated 1, 2, 3, and 4 to indicate the proposed sequence in which active renewal projects would proceed. The plan served "as an outline of the urban renewal activities proposed for the area involved (and), as a framework for the preparation of urban renewal plans * * *." (Ord., Sec. 8) The ordinance set up only one actual urban renewal project, Project No. 1, No. Ohio R-44, in the easterly area. It made no findings, set up no proposals and contemplated no early urban renewal activities in any other areas, including the area where plaintiffs' properties are located. There is no money available for the city to purchase properties here for urban renewal. There is no evidence of any other urban renewal plan or project (active or prospective) in the city of Cleveland today.

Each of the plaintiffs owns a dwelling house (8019 Hough

Avenue and 8111 Hough Avenue) in the area that is third in sequence for some active renewal project in the unspecified future. One structure is at least seventy-five years old. The houses are best described by the pictures that accompany Joint Exhibits D and E, and by the Housing Inspectors' reports therein. They have been long vacant, thoroughly vandalized and contain no usable plumbing, lighting, or heating fixtures; walls are cracked; second and third floor windows are broken and open (permitting snow and rain to permeate and rot ceilings, walls and floors); some downspouts do not connect with underground sewers and water flows over neighboring areas; overhead drains appear loose, in one instance chimney bricks are loose; in another, boards on the back porch are rotted and loose. As to 8019 Hough as late as March, 1965, "children of the neighborhood were getting into the house" (Joint Ex. D.), this after a report of October 16, 1964 indicated: "Majority of the exterior openings have been secured, however, rear door glass panel has been broken out." Inspection on June 16, 1964 indicated among other things: "3. This structure is infested by rodents. 8. The banister of the rear porch, up, is loose. 9. The chimney has collapsed and created a hazard." (Joint Ex. D-9.) As to 8111 Hough Avenue, the front eaves are broken and a danger. Presently the first floor openings of both dwellings have been boarded up and are not necessarily fire hazards.

Turning now to the city ordinances which may apply to the situation revealed by the evidence in the case, the court observes that there are two parts of the codified ordinances of the city stressed in the evidence. Part Five is the Building Code. (Joint Exhibit B.) Section 5.0708 defines unsafe structures:

"*Unsafe Structures.*

"(A) General. All buildings or structures which are structurally unsafe, insanitary, or not provided with adequate safe egress, or which constitute a fire hazard, or are otherwise dangerous to human life, or which in relation to existing use constitute a hazard to safety or health by reason of inadequate maintenance, dilapidation, obsolescence, or abandonment are, severally, for the purposes of this Title, declared to be unsafe structures. All such unsafe structures are hereby declared to be illegal and shall be abated by repair and rehabilitation or by demolition in accordance with the following procedure:

"1. Examination of Unsafe or Damaged Structures. The Commissioner of Building and Housing shall examine or cause to be examined every building or other structure reported to be unsafe or damaged, and shall make a written record of such examination.
"* * *"

The ordinance then provides for notice to the owner, posting of condemnation notice on the building, and a right of appeal to the Board of Building Standards and Building Appeals (whose duties are fully set forth in Section 5.0717). The Building Code applies to all structures whether occupied or not, and whether boarded up or not.

Part Six, the Housing Code (Joint Exhibit C), is concerned with standards, restrictions and remedies which must be applied to structures intended primarily for human occupancy. It deals with the requirements for habitable rooms, window area, ventilation, sanitary facilities, safety, health, foundations, exterior walls and roof and the like.

Nowhere is there a provision that an owner may exempt himself from the provisions of the housing code when his building is vacant by boarding up the first floor appertures, letting upper windows open to the weather.

Chapter 13 of the Housing Code provides in detail for enforcement, inspection, notice to owners in violation of the established standards, steps to be taken if there is non-compliance with a notice of violations or for demolition, and the right of appeal (Section 6.1309) by any owner who thus may challenge such notice and "suspend action on enforcement."

A review of Joint Exhibits D and E gives a picture of what steps have been taken relative to the plaintiffs' properties. As to 8019 Hough, as early as March 7, 1955, five violations were on record. On May 24, 1963, it was reported that the "chimney has collapsed." By October 30, 1963, the structure was "open, vacant and vandalized." December 5, 1963, the Commissioner of Housing notified the plaintiff Tower Development and Investment Corporation, Inc., of 14 violations and indicated a permit should be obtained to make repairs. No response. January 10, 1964, a report indicated "vagrants have been breaking the windows." By April 15, 1964, "all exterior openings have been boarded up." July 14, 1964, the owner was again notified

of 14 violations and that "this structure is injurious to the public health and safety and constitutes a public nuisance. The structure shall be demolished * * * or violations set forth shall be corrected." No response. July 15, 1964, a "condemnation sign (was) posted on this structure." October 14, 1964, the Commissioner of Housing reminded Tower of the notice of July 14, quoted from Section 6.1305 of the Housing Code, and requested cooperation to remedy the violations by compliance. No response. February 2, 1965, the exhibit indicates, the structure was "again open, vacant and vandalized. This structure is approximately one block from the Addison Junior High School and in its present condition has led to numerous complaints." March 3, 1965, "House vacant for 4 months. Children of neighborhood getting into house." March 4, 1965, Mr. M. Schulman wrote the Director of Urban Renewal entering appearance as attorney for plaintiff Tower (a Pennsylvania company which was then licensed to do business in Ohio, but has since lost the same and is not doing business here). He asked that no steps be taken to demolish the house until he could look it over. This was the first appearance of any sort by a representative of the owner, a year and a half after the first request to it to eliminate violations, and almost a year after condemnation. September 22, 1965, Mr. Schulman was informed by the Commissioner of Housing: "There is a violation notice for this structure on record." At no time did the owner or any agent take any steps to comply with violation or demolition notices, or to pursue administrative appeals therefrom. Mr. Schulman is a real estate consultant and attorney; he has invested in property in the Hough area; and he is familiar with the building and housing codes and the appeals provided therein. In December 1965, he filed on behalf of Tower suit No. 27612 in the Court of Appeals of this district, seeking by mandamus to compel the city either to buy or take off the demolition list the same 8019 Hough Avenue involved in this action. A demurrer has been sustained to that petition.

As to 8111 Hough Avenue the file (Joint Exhibit E) is voluminous and violation notices of one sort or another go back to 1941 when the structure was being converted from a single home "into 9 separate housekeeping suites." In September 1954, the then owner had "failed to make full compliance with

a prior violation notice.'' In 1962 violations then existing were corrected and April 16, 1963, a certificate of occupancy was issued to the then owner, Keystone Mortgage Corporation. When inspected May 14, 1963, 9 violations still were found and the owner was so notified. Another certificate of occupancy was issued April 16, 1964. May 29, 1964, there was another inspection and it reported 7 violations. The property was last occupied by a tenant in June 1964. Thereafter the property, left unprotected by the owner, was vandalized. On January 20, 1965, defective and exposed wiring was found, and, in all, nineteen building and housing violations were reported. The violations were not confined to the inside of the house. The commissioner found the structure injurious to the public health and safety, and notified the owner, warning that under the code it would have to be repaired or it would be demolished. A condemnation sign was posted on the structure. The owner was apparently in bankruptcy by this time and the trustee did not respond. May 7, 1965, the mortgage holder was duly notified of the violations, referred to Section 6.1305, and advised that demolition was ''being referred to the city council of Cleveland for approval of funds to raze this structure.'' No response. Again on July 23, 1965, due notice of 17 violations was sent to the trustee with warning of demolition and still with the chance to make repairs to meet code standards. (Joint Exhibit E-1.) No response. Mr. Schulman acquired title to this property some time in the last summer (August of 1965). The property was boarded up when he saw it first in January 1965; he never was inside the house; he made no effort to see whether there were violations or a condemnation on file at city hall; he testified he ''had no previous knowledge of any violations on either building prior to the filing of the lawsuit,'' and likewise as to condemnation. He made no effort to rehabilitate the structure but checked to see that all ground floor openings were secure. On one occasion he had to replace torn out boards which someone had pulled off. He conceded that since upstairs windows were out rain and snow might warp floors and destroy plaster.

It is a fact that a large number of properties in the Hough area and elsewhere in the city have been vandalized as soon as they become vacant. Most of these have been boarded up, and ''sometimes numerous boardings have been necessary'' (Was-

serstrom's testimony). To protect his property an owner should have either a tenant or a guard in it. There are not enough police officers on the force adequately to protect all vacant property in the city.

The testimony of Ben Frankel, at the hearing on motion for a temporary restraining order (which with misgivings the court allowed to be made a part of the record herein after Frankel's death) indicates that of some 300 properties which he or his companies owned, fifteen or a few more were on the list for demolition; had been vandalized and boarded up, his architect had made sketches for some repairs and when permits were applied for to repair (long after the time allowed) in most instances they were refused. Three permits that had been granted were voided for non-compliance. Of the properties referred to, most did not lie within the area of University-Euclid Urban Renewal Plan (Pltfs' Exhibit 3). He never paid attention to violation notices containing condemnation orders. He filed no appeals.

In the Housing Code, Sections 6.1304 and 6.1305 read as follows:

"*Section 6.1304 Notice of Violation.*

"(a) Whenever the Commissioner of Housing shall find any dwelling structure or premises, or any part thereof, to be in violation of the provisions of this Code, he shall give or cause to be given to the owner, agent or person in charge of such structure or premises a written notice stating the violations therein. Such notice shall order the owner within a stated reasonable time to repair, improve or demolish the structure or premises concerned.

"(b) If the person to whom a notice of violation is addressed cannot be found within the city after reasonable and diligent search, then notice shall be sent by registered mail to the last known address of such person, and a copy of such notice shall be posted in a conspicuous place on the structure or premises to which it relates. Such mailing and posting shall be deemed legal service of notice."

"*Section 6.1305 Non-compliance with Notice.*

"(a) Whenever the owner, agent or person in charge of a dwelling structure or premises fails, neglects or refuses to comply with any notice, the Commissioner may issue a notice

ordering the structure or premises concerned to be vacated, or he may advise the Director of Law of the circumstances and request the Director to institute an appropriate action at law to compel a compliance, or both.

"(b) Whenever the owner, agent, or person in charge of a dwelling structure or premises fails, neglects or refuses to comply with a notice to vacate issued by the Commissioner of Housing, the Commissioner may request the Director of Public Safety to enforce the orders of such notice of vacation and cause the structure to be vacated in accordance with the terms of such notice.

"(c) Whenever the owner, agent or person in charge of a dwelling structure fails, neglects, or refuses to comply with a notice to demolish issued in accordance with the provisions of this Code, and when such dwelling structure is determined by the Commissioner of Housing to constitute a public nuisance in that it is injurious to the public health, safety or welfare, the Commissioner may request the Director of Law to prepare legislation stating such determination and authorizing the Director of Urban Renewal and Housing to enter into a contract for the demolition of such structure, or to take such other action as may be necessary to abate the nuisance. The Commissioner shall further give written notice informing the owner, occupant, lessee or mortgagee of such determination and action taken in conformance with the procedures set forth in this Code for the service of notice of violation.''

In 1965 the Federal government made available grants of money for the demolition of condemned properties in urban communities.

Thereafter, acting under authority of Section 1305(C) and Section 5.0708 and Section 3737.01, Revised Code, the council of the city of Cleveland enacted three ordinances declaring certain structures ''to be in a dangerous condition, beyond repair, and a nuisance'' and authorizing the Commissioners of Building and Housing ''to cause the same to be razed'' and ''directing the execution of one or more contracts therefor'' (Exhibits B, C and D, attached to plaintiffs' petition).

Ordinance No. 2267-65, effective October 11, 1965, lists 244 structures on the east, west and south sides of the city, but none is in the University-Euclid Urban Renewal area. Ordinance No.

2266-65, effective October 27, 1965, uses the same language as its predecessor, and lists 265 houses, east, west and south, of which only 43 (including 8111 Hough Avenue) are in the University-Euclid area. Ordinance No. 2278-65, effective December 8, 1965, was passed in the same manner, listing 145 structures of which 8019 Hough and three others are in the University-Euclid area. Thus while a total of 654 structures throughout the city have been condemned and ordered razed, there is no evidence (with minor exception) as to their condition, pursuit of remedies or whether located in any urban renewal project.

CONCLUSIONS OF LAW.

If this were purely a suit in equity, or a taxpayer's action at common law, the court would have no hesitancy in saying that plaintiffs would have to exhaust their remedies at law before suing in equity. Such a situation existed in *Meeker* v. *Scudder* (1923), 108 Ohio St. 423, in which the second paragraph of the syllabus states: ''The law having provided for an appeal from the action of the state medical board, a party who has not exhausted his rights under such appeal cannot invoke a court of equity to enjoin the operation of the law upon the ground that the statute is in violation of some provision of the Constitution.''

To the same effect is *State, ex rel. Gund Co.,* v. *Village of Solon* (1960), 171 Ohio St. 318, which was an action in mandamus asking the court to issue a building permit that had been refused by the village, without appeal first having been taken to the Board of Zoning Appeals. The court held: ''Chapter 2506, Revised Code, provides a remedy by judicial review of final orders of administrative boards of municipalities. Relator had an adequate remedy at law by way of appeal to test the claimed invalidity of the zoning ordinance.''

However, plaintiffs' action herein is a statutory one, even though the relief sought is in part equitable in nature. They challenge the constitutionality of Ordinances 5.0708 and 6.1304 and the action of council based thereon. They allege abuse of corporate powers. They obviously maintain the action to protect their own interests and those of the citizen at large. While plaintiffs' failure to exhaust administrative remedies was notorious and flagrant, still the court is of the opinion that it does not bar them from their day in court, on some of the questions

raised in their petition, under favor of Sections 733.56 to 733.59, Revised Code, and kindred Sections 87 to 90 of the charter of the city of Cleveland.

Sections 733.56 to 733.59, Revised Code, contemplate that a taxpayer must "show some beneficial interest in himself, even though it is no greater than that of the general public." 52 Ohio Jurisprudence 2d, Taxpayers' Actions, Section 6. This the plaintiffs have done. Among possible grounds for relief are to prevent abuse of corporate powers and to enjoin enforcement of invalid ordinances. 52 Ohio Jurisprudence 2d, Taxpayers' Actions, Section 11 *et seq.* Plaintiffs' petition and the theory of their cause of action as developed during the trial bring them within Section 733.56, Revised Code, and of Sections 87-90 of the charter of the city of Cleveland.

"Municipal officers and boards in the exercise of the police power often command and enforce restraints upon the use of private property which do not amount to the taking of property without due process, although there is no hearing, and from the doing of which they cannot be enjoined. * * * But an owner whose property has been interfered with or taken has at some time and in some form the right to have it judicially determined whether the interference and taking were rightful." *Pelkey* v. *National Surety Co.* (1919), 143 Minn. 176, 173 N. W. 435.

The court, however, should observe that there are aspects of the case which concern only the plaintiffs' properties. There is no evidence which permits the court to decide whether or not the property of any other individual should be demolished, if the ordinances on which such action was based are valid. In any event the determination of the question of what is or is not actually a nuisance is properly limited by evidence as to the dwellings owned by the plaintiffs. Certainly the status of over 600 structures could not be examined in this action.

On the other hand, if the provisions of the Housing Code and the Building Code under which the city acted to condemn what it found to be sub-standard structures are in violation of plaintiffs' constitutional rights, and likewise if council's action in providing for demolition is unconstitutional, then none of the 654 condemned dwellings in the city may be torn down. Thus plaintiffs' action as taxpayers would throw out the questioned ordinances and inure to the benefit of all property owners who

had been similarly affected by the city's actions based thereon. It follows that exhaustion of administrative appeals is not required to bring such a suit since it challenges legislative action which may be tested in a statutory taxpayer's suit.

At the outset the court can eliminate some of plaintiffs' contentions which, in its judgment, were not sustained by the greater weight of the evidence. The city did not embark on a planned program of demolition of all vacant buildings because of its failure to prosecute urban development or its failure to provide adequate police and fire protection. The testimony does not so indicate, and the court can draw no such inference in an effort to find a simple answer to a vast and complicated problem common to many cities today. The city's officials initiated no scheme of demolition to conceal any "willful negligence and fraud" from anyone in programming urban development, and they engaged in no plan to get without purchase properties "which they knew would be designated for urban renewal in the near future" (Petition, paragraph 8). There has been no "false, fraudulent and pretended use of (the city's) police power" (Petition, paragraph 21). There is no basis for awarding any compensation for any buildings demolished or about to be demolished, as prayed for. There is not a word of testimony that the two structures in question or any others have any monetary value whatsoever or that the plaintiffs have suffered or are about to suffer any compensable loss.

The right of the city to enact ordinances governing the erection, use, maintenance, occupancy and condemnation of privately owned structures stems from its inherent police power, "an indispensable prerogative of sovereignty and one that is not to be lightly limited." *Miller* v. *Board of Public Works* (1925), 195 Cal. 477 at 484. Oft quoted is the Constitution of Ohio, Article I, Section 19:

"Private property shall ever be held inviolate, but *subservient to the public welfare* * * *." (Emphasis added.)

The police power is closely concerned with the preservation of the public peace and general welfare, safety, morals and health. As is pointed out in 8 Ohio Jurisprudence 2d, Buildings, Section 3:

"* * * Laws relating to buildings and enacted in the proper exercise of the police power, which are reasonably necessary

for the preservation of the public health, safety, and morals, even though they result in the impairment of the full use of property by the owner thereof, do not constitute a 'taking of private property' within the meaning of the constitutional requirements as to making compensation for the taking of property for public use and as to the deprivation of property without due process of law. * * *''

In 14 A. L. R. 2d 74, the general principle of law is stated as follows:

''Under the police power, the government may prevent an owner of property from using it in such manner as directly to inflict or threaten public harm as traditionally defined, or from permitting it to remain in a condition to inflict or threaten such harm. Every individual holds his property subject to this power. It includes the power to destroy the property if such destruction is reasonably necessary to accomplish the purpose. In such a case, the property is deemed a public nuisance and its destruction falls within the general power of public agencies to abate such a nuisance. * * *''

The decisions are clear that the exercise of the city's police power must be reasonable and not arbitrary. Ordinances as to housing enacted under the cloak of police power must be reasonably necessary, relate to the public, health, morals, safety or welfare, and must not deprive a citizen of his property without due process. In *Solly* v. *City of Toledo* (1966), 7 Ohio St. 2d 16, in the first paragraph of the syllabus, the court said:

''A charter city may enact legislation, not in conflict with general laws, authorizing the summary abatement of public nuisances and the destruction of property used in maintaining such nuisances when reasonably necessary to effectuate their abatement.''

Do the sections of Cleveland's Building Code and Housing Code authorize the taking of private property without due process; do they lack ''standards of guidance''; are they unconstitutional as plaintiffs contend? Or, on the other hand, are they a reasonable and necessary use of the city's police power?

It is the court's duty, in examining building and housing code regulations to give them ''a construction, * * * where possible, which effectuates the obvious purpose of their enactment.'' *State, ex rel. Euclid-Doan Bldg. Co.,* v. *Cunningham, Commr.*

(1918), 97 Ohio St. 130. The codes, therefore, must be examined and interpreted as a whole, not merely piecemeal, in order that their meaning and reasonableness may be weighed.

The purpose of the Building Code is defined in Section 5.0102:

"Within the scope of this Code as hereinafter defined, the purpose of this Code is to provide minimum standards to safeguard life or limb, health, property, and public welfare." The general scope of the code is described in the next section. Thereafter it indicates that it applies to new buildings and to additions, alterations and repairs of existing structures and to changes in use and occupancy. It provides in detail for issuance of permits for erection of new buildings and the alteration of old ones. It sets up definite, detailed standards which must be observed. The residential requirements alone take up at least 25 pages in the code. (Joint Exhibit B.) The heart of the code, so far as this case is concerned, is Section 5.0708, which has been set forth in full above. It defines "unsafe structures," provides for their examination, and for written notice to the owner of such with the requirement that he complete specified repairs or demolish or remove the building. In subsection 4 it gives a definite right of appeal from the decision of the commissioner to the Board of Building Standards and Building Appeals. Section 5.0717 describes the duties and procedures of the board in handling appeals. Subsection (g) 3 says:

"A person aggrieved by a decision of the Board of Building Standards and Building Appeals may within 15 days after the posting or publication of such decision apply to the appropriate court to correct errors of law in such decision."

The Housing Code (Joint Exhibit C) must be considered in the light of its relationship to the Building Code. Its purpose is set forth in Section 6.0102:

"Within the scope of this Code as hereinafter defined, the purpose of this Code is to establish minimum standards necessary to make all dwelling structures safe, sanitary, free from fire and health hazards, and fit for human habitation and beneficial to the public welfare; to establish minimum standards governing maintenance of dwelling structures in safe and sanitary condition; to fix responsibilities for owners and occupants of dwelling structures with respect to sanitation, repair and main-

tenance; to establish additional standards for rented or leased dwellings and rooming occupancies; to authorize the inspection of dwelling structures; to establish enforcement procedures; to authorize the vacation or condemnation of dwelling structures unsafe or unfit for human habitation; and to fix penalties for violations."

Chapter 5 of the Housing Code establishes "Basic Standards for Residential Occupancy," and in 20 sections sets forth in detail the requirements for making and keeping a dwelling structurally safe, free from hazards, sanitary and fit for human habitation. Chapter 7 provides additional standards for rental dwellings. Chapter 13, of which plaintiffs complain particularly, deals with enforcement, authorizes inspections, and in Section 6.1304, quoted heretofore, says that when the commissioner finds premises *"in violation of the provisions of this code"* he shall give the owner written notice and a reasonable time to make repairs, otherwise to demolish. Upon an owner's non-compliance, when the commissioner determines the structure is a public nuisance he may request the Director of Law to prepare legislation stating such determination and authorizing a contract for the demolition or "such other action as may be necessary to abate the nuisance." The commissioner must give written notice informing the "owner, occupant, lessee, or mortgagee of such determination and action taken in conformance with the procedure set forth in this Code for the service of notice of violation."

The court holds that the provisions as to notice were reasonable and were observed with care by the Commissioner of Housing. The plaintiff Milt Schulman acquired his property in August 1965. It was boarded up when he bought it. He was on notice of its condition for he is a skilled and knowledgable person so far as real property in the area goes.

In the article on Notice and Notices, 39 American Jurisprudence, it says at page 238:

"A person has no right to shut his eyes or his ears to avoid information, and then say that he has no notice; he does wrong not to heed the 'signs and signals' seen by him. It will not do to remain wilfully ignorant of a thing readily ascertainable, and it is no excuse for failure to make an inquiry, that if made, it might have failed to develop the truth."

Mr. Schulman stepped into the shoes of his grantor who for a long period had neglected all notices as to violations. The least inquiry by Mr. Schulman would have revealed the true situation just as a visual inspection of the premises must have done.

Section 6.1309 provides for appeal to the board and makes it clear that "filing of an appeal from any notice of the Commissioner of Housing shall *suspend action on enforcement* of such notice until the appeal is acted upon. * * *" (Emphasis added.)

It is obvious on studying the codes within their four corners that they are enacted by virtue of the city's inherent police power. They set up standards throughout, and not merely in one isolated section, which are clearly intended to protect life, health and property and promote the public welfare. Their language as to requirements is definite and specific. Ordinances such as this are not self-operative. Men must make them work —department heads, inspectors, city council, yes, and property owners with a sense of civic duty.

The court quotes with approval plaintiffs' citation in their brief of *State, ex rel. Bruestle, City Solicitor,* v. *Rich, Mayor* (1953), 159 Ohio St. 13, in which it is stated in the fifth paragraph of the syllabus that:

"The elimination of slum and other conditions of blight and provisions against their recurrence are ordinarily conducive to 'the public welfare' as those words are used in Section 19, Article I of the Ohio Constitution."

Plaintiffs contend that Sections 5.0708 and 6.1305 do not provide proper objective standards, are void for vagueness and uncertainty and amount to an illegal delegation of legislative power. The objective standards which the commissioners and their subordinates must follow in passing on the safety, sanitation and soundness of a structure are spelled out in the codes, not merely in the two sections cited. As Section 6.1304 says, when the commissioner finds premises "*to be in violation of this code*" he shall proceed to act, giving due notice and a chance for the owner to make repairs before demolition. How else can the condition of a structure be determined except by inspection and the decision of someone qualified to be guided by and to apply the standards set up in full in the codes? The court is at a loss

to find any vagueness in the codes or any unlawful delegation of legislative power. Finding violations and giving the owner specific citations to the sections that an owner is alleged to be violating, a commissioner is not usurping a legislative function but is acting to enforce the law.

The plaintiffs rely on *Village of Deshler* v. *Hoops* (1963), 93 Ohio Law Abs. 335, a case wherein the Common Pleas Court of Henry County found a village ordinance to be void. The ordinance was a penal one, its language was not clear, it set up no standards for determining when a structure was "old," an "eye-sore," "unpainted," "unsafe," "attractive to children" and the like. The court held that the ordinance was void for uncertainty and, in the third headnote, that it "was enacted entirely for esthetic considerations and thus is an unconstitutional exercise of the police power and is void."

The facts do not square with those in the present case and it offers no precedent for this court to follow.

In *Yee Bow* v. *City of Cleveland* (1919), 99 Ohio St. 269, the court said (pp. 273-4):

"It is now generally held that quasi-judicial duties and administrative functions may be imposed upon administrative officers for the purpose of ascertaining the conditions under which the law or ordinance becomes effective. It will not be presumed that the action of the administrative officer will be either arbitrary or unwarranted. Should it so prove to be, the aggrieved person would have the right to relief through the courts. * * * But it is now generally held that discretionary powers may be lodged in administrative officers to determine whether the terms of a law or ordinance of this character have been complied with, and that such 'terms like other general terms get precision from the sense and experience of men.' * * *"

*Matz, Admr.,* v. *J. L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, goes even further and lays down this general principle in the seventh paragraph of its syllabus:

"As a general rule a law which confers discretion on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable

to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations.''

The plaintiffs contend further that the Housing Code, particularly Section 1305, ''is a complete circumvention of due process'' since it deprives the property owner of a right to a judicial determination of whether the property is a public nuisance.

The court agrees with plaintiffs' citation of *Ghaster Properties, Inc.*, v. *Preston. Dir.* (1962), 89 Ohio Law Abs. 16. The Common Pleas Court of Allen County said (p. 21): ''In order to be a constitutional exercise of the police power of the state, legislation must bear a substantial relation to the public health, morals, safety or welfare.''

When the case reached the Supreme Court, *Ghaster Properties, Inc.*, v. *Preston, Dir.* (1964), 176 Ohio St. 425, the court said that the contention of the owner of the billboards that the state under Sections 5516.01 to 5516.99, Revised Code, takes private property without compensation and that property includes the right to use land and that, therefore, the deprivation of such right by the prohibition of the statutes is a taking in part of property is fallacious because necessarily based upon the assumption that the ownership of land includes an unrestricted right to use it, whereas in fact ''*an owner's right as a user * * * is limited to a 'lawful' * * * use.*'' (Emphasis added.)

In *Miami County* v. *City of Dayton* (1915), 92 Ohio St. 215, the court says (p. 225):

''The 'due process' clause has been much abused and stretched to limits never designed by the constitution-makers. But it must be observed that it is not the deprivation of property that is prohibited by this amendment, but the deprivation of property *without due process of law.* Full provision is made at every stage of the conservancy act, from the time of the filing of the petition to create a conservancy district until the last step is taken, for the assertion of any and all rights by any and all parties affected by this act. Every person substantially affected is given a 'day in court' from the time of the organization of the district until the proposed improvement is completed. * * *''

The ordinance of which plaintiffs complain at every step

provides for notice, the opportunity for the owner to correct alleged violations, or his right to appeal to the board.   Further, Chapter 2506., Revised Code, assures "a remedy by judicial review of final orders of administrative boards of municipalities." *State, ex rel. Gund Co.,* v. *Village of Solon* (1960), 171 Ohio St. 318.   The plaintiffs or their predecessors in interest chose to ignore all notices given them for almost two years before their premises were condemned as unsafe and unsanitary. Had they sued individually and not as taxpayers they would have no standing in equity because of laches and failure to exhaust their legal remedies.   In *Solly* v. *Toledo, supra,* the court on page 11 cites *DiMaggio* v. *Mystic Bldg. Wrecking Co., Inc.* (1960), 340 Mass. 686, "where plaintiff, who neglected to take advantage of administrative hearing, held barred from attacking administrative determination of public nuisance."   But as pointed out in 52 Ohio Jurisprudence 2d, Taxpayer's Actions, Section 27, "Personal laches will not defeat a taxpayer in a suit brought to vindicate the rights of all taxpayers."

The law is stated thus in 10 Ohio Jurisprudence 2d, page 433, Constitutional Law, Section 359:

"A reasonable exercise of the police power does not constitute a taking of property and does not violate due process. The guarantee of due process in police legislation demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."

The court is of the opinion that the challenged ordinances are reasonable and assure property owners of equal protection of the law, due process and do not violate the Constitutions of either Ohio or the United States.

The plaintiffs take exception also to Ordinances 2267-65, 2366-65 and 2578-65, set forth above, which were passed by the council, on the grounds that they were passed without prior public hearings, or notice to plaintiffs, or due process, and in excess of council's lawful powers, and that they take property without compensation.

Power to enact the ordinances stems from the two sections of the codes dealt with in detail above.   The legislation recites that the proper city officials, pursuant to the codes, have determined that each of the listed structures "is either in an unsafe,

hazardous condition or abandoned or structurally unsafe or especially liable to fire." The ordinances find that all owners have been duly notified and have failed to comply, and that the Commissioner of Housing has been duly authorized to cause the structures to be demolished. Section 1 of each ordinance says: "That the structures herein enumerated are hereby declared to be a *menace* to the public health and safety and a nuisance." (Emphasis added.) The ordinances then authorize the making of contracts for the razing of the structures. The emphasis is on the menace to health and safety. The word "nuisance" could just as well have been omitted.

As pointed out in 10 Ohio Jurisprudence 2d 227, Constitutional Law, Section 152:

"The courts have power to review the legislative determination as to what is the proper exercise of police power, but such review is limited and courts are inclined to *defer to the judgment of state or municipal legislative body* to which the matter is committed in the first instance and *will not interfere* unless it is clear that the statute or ordinance has no real or substantial relation to public health, morals, safety or welfare, or is unreasonable or arbitrary or infringes rights secured by the fundamental law." (Emphasis added.)

It is clear, however, as pointed out in 39 American Jurisprudence, Nuisances, Section 185, page 458: "General statutory authority to define and abate nuisances does not authorize a municipality to declare that to be a nuisance which is not a nuisance in fact." Again the power of council must be *reasonably* exercised, and no wanton or unnecessary injury done to the rights of individuals. Since the council acts under its general power it "may abate or remove a nuisance without liability where the owner has been notified and given a reasonable opportunity to remove it and has failed to do so." (Same, Section 186, page 462.) Also "if property taken or destroyed as a nuisance is in fact a nuisance, the owner is *not entitled to compensation.* * * *" (Same, Section 188, page 464.)

It must be borne in mind that the legislation arises out of Housing Code Section 6.1305(c), which contemplates that code violations, resulting in structures being injurious to the public safety, health and welfare, permit the Commissioner of Housing to determine that such structures are a public nuisance. Council

merely placed its stamp of approval on the finding made in due form by the commissioner. There was no need for the ordinances to define "nuisance" in any more detailed terms than it used, since the whole purport of the codes is clear. Violations, differing in the case of each specific structure, result in a public nuisance. "The term (nuisance) has a well defined legal meaning, and in legal phraseology applies to that class of *wrongs which arise from the unreasonable, unwarrantable or unlawful use by a person of his own property. * * *"* (Emphasis added.) 66 Corpus Juris Secundum, Nuisances, Section 1, page 727.

The court sees no reason why council needed to have public hearings or any more notices to plaintiffs than were sent them by the commissioner of housing. As a matter of fact the owner of 8111 Hough was notified that the demolition was being referred to council for approval of funds to raze the structure. (See preceding findings of fact.) All of the sections of the codes, and the three ordinances passed under that authority, are equally applicable to all property owners similarily situated. Enforcement likewise was without discrimination: it singled out no one area alone but sought to remove structures in widely scattered sections of the city.

In *Antonelli* v. *City of Youngstown* (1934), 18 Ohio Law Abs. 542, the Court of Appeals of the Seventh District said in the second headnote:

"A city council in passing an ordinance declaring what things may constitute a nuisance is acting in its legislative capacity, and in the absence of an abuse of the discretion in such council, it may declare what are nuisances, and if the facts warrant such a declaration, such ordinances will be sustained."

The court holds that the council acted within its legal authority in passing the three demolition ordinances.

One final question remains: Are the plaintiffs' properties in fact public nuisances? It is clear that the owners are entitled to a judicial determination of this question.

"Whether a nuisance exists or not in a particular case justifying the exercise of the power by the municipal authorities, is a question of fact to be determined from the nature of the nuisance and the evidence." *Lawton* v. *Steele* (1894), 152 U. S. 133.

Heretofore the court has recited what the evidence clearly

shows is the condition of the plaintiffs' two properties. There is before the court the description of the plaintiffs' structures and others which likewise have been vandalized, boarded up, left unsanitary and a refuge for rats, exposed to the elements because of upper story broken windows, having loose gutters and broken downspouts spewing drain water over the neighborhood, and with the probability of boards being torn off periodically to admit juveniles—in short, festering sores on the face of a great city.

An owner cannot escape responsibility or eliminate the violations merely by boarding up a condemned building and just letting it stand. The external violations are still there and, as the evidence here shows, a board may easily be torn from a closed opening to admit anyone intent on mischief or unlawful conduct. The violations still stand. The nuisance is there for all to see.

The court has no power to pass judgment on the social and economic factors which have contributed to the conditions displayed by the evidence in this case. It is sufficient to say that they should be of deep concern not only to the inner-city but also to all who claim the larger community as their residence.

The owners of many properties in slum areas have paid no attention to the city's lawful demands that they fix up their premises, but have allowed them to deteriorate and become a menace in many neighborhoods.

The city by the actions here narrated has taken steps to remedy a serious situation. This court sustains the legislation and the steps taken to enforce it, and finds that the plaintiffs and others similarly situated have been justly dealt with. The structures in question are in fact and in the sight of the law public nuisances. The demolition of the premises set forth in the ordinances should proceed without delay to the end that the nuisances may be abated. The court therefore renders judgment for the defendants, the City of Cleveland, Mayor Ralph S. Locher, and all other officials and firms made parties defendant. Plaintiffs' petition is dismissed at their cost.

*Petition dismissed at plaintiffs' cost.*